HUNTER, JR., Robert N., Judge.
Daniel Richard McCoy ("Defendant") appeals from a 4 February 2016 judgment entered after a jury convicted him of first-degree sex offense with a child and indecent liberties with a child. Defendant primarily argues the trial court committed plain error in failing to instruct the jury on the offense for which Defendant was indicted. Even though Defendant was charged with First-degree sex offense with a child under N.C. Gen. Stat. § 14-27.4(a)(1), the body of the indictment alleges the elements for Sexual offense with a child, adult offender under N.C. Gen. Stat. § 14-27.4A(a). The trial court instructed the jury on First-degree sex offense with a child, which is a lesser included offense of Sexual offense with a child, adult offender. The jury convicted Defendant of the lesser included offense for which Defendant was indicted. Because the judgment sheet is ambiguous as to whether the trial court sentenced Defendant for first-degree sexual offense under N.C. Gen. Stat. § 14-27.4(a)(1) or for sexual offense with a child; adult offender under 14-27.4A, we vacate Defendant's sentence and remand to the trial court for re-sentencing the Defendant for the offense for which he was convicted: First-degree sexual offense under N.C. Gen. Stat. § 14-27.4(a)(1), a class B1 felony.
Defendant also argues the trial court erred by: (i) precluding evidence that could impeach the prosecuting witness's credibility; (ii) allowing the State's expert witness to vouch for the prosecuting witness's credibility; (iii) ordering Defendant to submit to lifetime registration as a sex offender; (iv) ordering Defendant to enroll in lifetime satellite-based monitoring ("SBM"); and (v) entering a judgment containing a clerical error. We conclude the trial court committed no error as to its rulings on the exclusion of evidence and allowing witness testimony. However, we conclude the trial court did err in ordering Defendant to enroll in lifetime satellite-based monitoring and to submit to lifetime registration as a sex offender. The trial court also did not commit a clerical error in entering Defendant's judgment.
I. Factual and Procedural Background
On 2 December 2013, an Alamance County Grand Jury indicted Defendant on first-degree rape, first-degree sex offense with a child, and indecent liberties with a child.
On 25 January 2016, the trial court called Defendants' case for trial. Prior to jury selection, Defendant filed several motions in limine which the court immediately addressed. In the first motion, Defendant requested the trial court to exclude statements by Nathaniel Newton ("Newton"). Defendant contended Newton's testimony was "tainted and solicited and/or obtained illegally." Defendant also contended Newton's recorded testimony constituted hearsay. The trial court reserved its ruling on this motion until it could review the recorded testimony.
In Defendant's next motion, Defendant requested the trial court to "exclude opinion testimony that would include conclusory statements by State's expert witnesses." Defendant's examples of such statements included "it is possible that the child has been abused or the child suffers emotional problems as a result of abuse, and or the child's symptoms are consistent with abuse." Defendant contended those statements, under North Carolina case law, are meaningless and "not helpful or confusing to the jury." The State asserted an expert witness is allowed to express an opinion, and whether an opinion is appropriately worded is a matter for an objection during trial. The trial court granted Defendant's motion to prohibit an expert from stating the alleged victim "suffered from or had probably-problems that she's been abused." However, the trial court would allow testimony stating the alleged victim had "symptoms being consistent with an individual.... that has been sexually abused."
The State first called the alleged victim, Carla. Carla was born on 14 June 2001, and at the time of trial, Carla was fourteen years old. Defendant is Carla's uncle. In 2009, when Carla was around seven years old, she lived with her mother, her younger brother, and her maternal grandparents in her grandparents' home in Burlington, North Carolina. Defendant also periodically resided in the grandparents' home around this time. Carla's grandfather was "bed bound."
One day, when Carla's grandmother left the house to pick up some medicine, Defendant called out to Carla. Carla did not go to Defendant because she was afraid. Defendant picked Carla up and took her to a bedroom. Defendant removed Carla's clothes. Defendant then put his penis inside her. Carla screamed. Defendant told Carla to "shut the hell up." Defendant then covered Carla's mouth so she could not continue to scream. Defendant then threatened Carla and her family. Defendant told Carla he would kill her grandparents if she told anyone what happened. This abuse continued "numerous times" over a period of two and a half years. Carla was unable to estimate how many times the abuse occurred.
Carla left her grandparents' house when she was between nine and ten years old. In 2013, after Carla's grandparents passed away, Carla returned to her grandparents' home to help go through their belongings. That day, Carla witnessed the police arrest Defendant on drug charges. Following Defendant's arrest, Carla and her family went to a restaurant. While at the restaurant, Carla's aunt received a phone call and learned Defendant had been released from jail. Upon learning this, Carla ran, screaming, into a nearby Dollar General Store
Later that same night, Carla was hysterical. She told her mother and her aunt Defendant had hurt her. Carla then wrote in her diary Defendant had forced her to perform oral sex on him, put his penis in her vagina and squeezed her breast.[1] Carla also wrote Defendant threatened to hurt her and her family if she told anyone.
Carla also told Police Sergeant Jennifer Matherly of the Burlington Police Department another man was present for two instances of abuse. This man's name was possibly Dave Scott, and he was Defendant's friend. However, in another interview, Carla stated only Defendant abused her. Carla was hospitalized three times for psychiatric issues.
Dr. Brian Wall, an expert in child psychology, testified for the State. At the time of trial, Dr. Wall had treated Carla for several years. Carla's symptoms were consistent with those of a child who's been sexually abused. Carla's symptoms:
[A]re consistent with a child who's been traumatized. The-what often ties to the thing she reported to me, the nightmares about her uncle, each time this case was to come to trial, more intrusive memories of what had occurred happened. More nightmares occurred. More sleep disturbance occurred.
Dr. Dana Hagele next testified for the State. Dr. Hagele is an expert in child abuse pediatrics. Dr. Hagele's interviews with children are medical in nature, and are not done for criminal investigations. Dr. Hagele sees post-traumatic stress disorder in sexually abused children. Carla presented all the criteria for post-traumatic stress disorder. During cross-examination, Dr. Hagele stated Carla's specific symptoms were consistent with post-traumatic stress disorder. Also on cross, Dr. Hagele stated it was theoretically possible a child could make up the sexual abuse.
Sergeant Matherly of the Burlington Police Department testified next for the State. She met with Carla once. During their interview, Carla stated Dave Scott was another possible suspect. Sargent Matherly identified a possible suspect based upon Defendant's prison visitation logs. However, Carla and her aunt were unable to make a "100% identification" during a photo lineup. At the time of trial, a Dave Scott had not been arrested.
The State called Nathaniel Jeremiah Newton ("Newton"). Newton met Defendant in jail. Newton befriended Defendant so Defendant would buy Newton food and other items in jail. Defendant first discussed his charges with Newton, but told him he did not molest his niece. However, Newton lied to Defendant and stated they were in jail for similar charges. Defendant then "opened up" to Newton.
Defendant told Newton Defendant's sister had left Carla with him while someone was at a Doctor's appointment. Defendant watched porn while Carla was in the house. He masturbated. At that point, Defendant went to his niece and started sexually "playing with her." Newton was curious why it took Carla so long to come forward with what happened. Defendant told Newton, "it was easy, you just threaten somebody they care about." Defendant also told Newton that Carla finally came forward because Defendant was arrested on a drug charge, and at that point she finally felt safe. Newton subsequently told his attorney and the District Attorney's office what Defendant told him.
The State rested, and the trial court excused the jury. Defendant moved to dismiss. Defense counsel told the trial court Defendant intended to testify. The jury returned, and defense counsel called Defendant as its first witness. The trial court made sure Defendant understood his rights in relation to his taking the stand.
Prior to Defendant's arrest, Defendant did not have a job. He was the sole caregiver for his parents. He was also on disability due to an injury from a car accident. He lived with his parents for about two and a half months sometime in 2005 or 2006. Carla was also living there during that time. Prior to his incarceration, Defendant "smoked marijuana off and on for many years," but rarely drank alcohol. He was also "definitely hooked on tobacco more than anything else in [his] life."
Defendant felt his relationship with Carla was "fine." He often picked her up from school and took her where she needed to go. Whenever Defendant was having a problem with Carla's mother, Carla would be aggressive toward Defendant and use profanity towards him.
Defendant recalled Newton's testimony. However, "when [Newton] walked into this courtroom, I remember just looking over and going, I don't know this man, I do not recognize this man at all."
Defendant also stated "there was a jailor going through my cell and I called [my attorney] on the phone because that was actually my hour out at the time that he was doing it. And I told [my attorney] they're going through my discovery and I was watching them do it at the time." Defendant also stated it was possible that people other than jailors went through his discovery since he "wasn't always in the block." Defendant also had a lot of visits from his friends and family. Defendant constantly talked with his visitors about his case. Defendant was also pretty sure others in the jail listened to his conversations.
Defendant next called Bradley McCoy ("Bradley"). Bradley is Defendant's older brother. The last time Bradley saw Defendant and Carla together was at Bradley's and Defendant's father's funeral. At that time, Defendant was upset and Bradley watched Carla console him. Additionally, Defendant babysat Bradley's daughter more than twenty times.
Defense rested and made a motion to dismiss. The trial court denied Defendant's motion. The trial court recessed the jury and began the charge conference. After seven hours of jury deliberations, the trial court stated:
The Court finds that the jury-it has been reported that the jury is hopelessly deadlock[ed] and I find that as to count one-that's the charge of first-degree rape-as to that count, the jury is hopelessly deadlocked and there's no reasonable possibility of agreement.
....
Consequently, as to count one, the charge of first-degree rape, a mistrial was declared as to that charge; the Court, on its own motion, declares that mistrial as to count one.
The jury then returned verdicts of guilty of first degree sex offense with a child and of indecent liberties with a child.
The State called Carla's aunt, Mary McCoy Wade, as a witness during the sentencing phase. Defendant also called three character witnesses, Crystal Wilson, Bruce McHugh, and Bradley McCoy. Defendant also testified during the sentencing phase, where he maintained his innocence.
The trial court stated:
The jury having returned verdicts of guilty first-degree sex offense, a Class B1 felony, and indecent liberties with child, a Class F felony, those charges are consolidated for sentencing into the first-degree sex offense charge.
The Court finds that Mr. McCoy has one record level point. He is a prior record level one for disposition purposes.
....
The judgment of the Court is that Mr. McCoy be sentenced to the North Carolina Division of Adult Correction for a minimum of 240 months and a maximum of 297 months. He is given credit for 977 days in confinement.
The trial court also ordered upon Defendant's release from prison, Defendant shall register as a sex offender and enroll in SBM for a period of his natural life. The trial court further ordered Defendant was prohibited from having any contact with Carla.
Defendant gave oral notice of appeal of his underlying convictions in open court. However, Defendant failed to file a written notice of appeal in order to challenge the trial court's 4 February 2016 orders regarding the sex offender registration and the SBM. Defendant filed a petition for writ of certiorari contemporaneously with his brief asking this Court to review the trial court's orders regarding SBM and lifetime sex offender registration. We grant review of Defendant's petition in this opinion.
II. Standard of Review
When a defendant fails to object to a jury instruction at trial, this Court reviews the instruction for plain error. State v. Juarez , --- N.C. ----, ----, 794 S.E.2d 293, 299 (2016). Under the plain error standard, a defendant must "demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.' " Id. at ----, 794 S.E.2d at 299-300 (quoting State v. Lawrence , 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) ). "[P]lain error is to be 'applied cautiously and only in the exceptional case,' " Lawrence, 365 N.C. at 518, 723 S.E.2d at 334 (quoting State v. Odom , 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) ), where a defendant can show that the error is "one that 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " Juarez , --- N.C. at ----, 794 S.E.2d at 300 (quoting Lawrence at 365 N.C. at 518, 723 S.E.2d at 334 ). For this Court to find plain error, "it must be probable, not just possible, that absent the instructional error the jury would have returned a different verdict." Juarez , --- N.C. at ----, 794 S.E.2d at 300.
Whether the probative value of evidence is substantially outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence" is a determination within the trial court's discretion. State v. Hyde , 352 N.C. 37, 54-55, 530 S.E.2d 281, 293 (2000) (quoting N.C. Gen. Stat. § 8C-1, Rule 403 (1999) ). The trial court's ruling on this issue "should not be overturned on appeal unless the ruling was 'manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.' " Id. at 55, 530 S.E.2d at 293 (quoting State v. Hennis , 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988) ).
On appeal from an order requiring a defendant to register as a sex offender, this Court reviews "the trial court's findings of fact to determine whether they are supported by competent record evidence, and ... review the trial court's conclusions of law for legal accuracy and to ensure that those conclusions reflect a correct application of law to the facts found." State v. Kilby, 198 N.C. App. 363, 367, 679 S.E.2d 430, 432 (2009) (quoting State v. Garcia , 358 N.C. 382, 391, 597 S.E.2d 724, 733 (2004) ) (citation, quotation marks, and brackets omitted).
III. Analysis
Defendant first contends the trial court committed plain error by failing to instruct the jury on the offense charged in the indictment. We disagree.
We begin our analysis of this issue by noting the indictment contains conflicting charges. At the top of the indictment, where the alleged offense is first set forth, Defendant's indictment reads "II. FIRST DEGREE SEX OFFENSE WITH CHILD" but lists the statutory cite as N.C. Gen. Stat. § 14-27.4(A)(1). The correct statutory citation for First-degree sex offense with a child is N.C. Gen. Stat. § 14-27.4(a)(1). That statute provides:
A person is guilty of a sexual offense in the first degree if the person engages in a sexual act ... [w]ith a victim who is a child under the age of 13 years and defendant is at least 12 years old and is at least four years older than the victim[.]
N.C. Gen. Stat. § 14-27.4(a)(1) (2013).
However, in the description of the offense on the bottom half of the page, the indictment alleges Defendant did "engage in a sexual act with C.A., a child who was under the age of 13 years. At the time, the defendant was at least 18 years of age." That is the language for "Sexual offense with a child, adult offender" under N.C. Gen. Stat. § 14-27.4A (2013).
"It has long been the law of this State that a defendant must be convicted, if convicted at all, of the particular offense charged in the warrant or bill of indictment." State v. Hicks , 239 N.C. App. 396, 407, 768 S.E.2d 373, 379 (2015) (quoting State v. Williams , 318 N.C. 624, 628, 350 S.E.2d 353, 356 (1986) ). "[T]he failure of the allegations [of the indictment] to conform to the equivalent material aspects of the jury charge represents a fatal variance, and renders the indictment insufficient to support [the] resulting conviction." Hicks at 407, 768 S.E.2d at 379 (quoting Williams at 631, 350 S.E.2d at 357 ). "In order for a variance to warrant reversal, the variance must be material." State v. Norman 149 N.C. App. 588, 594, 562 S.E.2d 453, 457 (2002) (quoting State v. McDowell , 1 N.C. App. 361, 365, 161 S.E.2d 769, 771 (1968) ). "A variance is not material, and is therefore not fatal, if it does not involve an essential element of the crime charged." Norman at ___, 161 S.E.2d at 457. The determination of whether a fatal variance exists turns upon two policy concerns, namely, insuring "the defendant is able to prepare his defense against the crime with which he is charged, and ... protect[ing] the defendant from another prosecution for the same incident. " Id. at 594, 562 S.E.2d at 457. "[A] variance ... does not require reversal unless the defendant is prejudiced as a result." State v. Weaver , 123 N.C. App. 276, 291, 473 S.E.2d 362, 371 (1996). However, "when a defendant is indicted for a criminal offense he may be convicted of the offense charged or of a lesser included offense when the greater offense in the bill includes all the essential elements of the lesser offense." State v. Barnes , 229 N.C. App. 556, 568-69, 747 S.E.2d 912, 922 (2013) (quoting State v. Snead , 295 N.C. 615, 622, 247 S.E.2d 893, 897 (1978) ).
This court concluded:
While both offenses [ § 14-27.4(a)(1) and § 14-27.4A ] require the State to prove that the defendant engaged in a sexual act with a victim who was a child under the age of 13 years, sexual offense with a child under N.C. Gen. Stat. § 14-27.4A has a greater requirement with respect to the age of a defendant at the time of the act. For first degree sexual offense, N.C. Gen. Stat. § 14-27.4(a)(1), the State must prove only that the defendant was at least 12 years old and at least four years older than the victim, whereas for N.C. Gen. Stat. § 14-27.4A, the State must prove that the defendant was at least 18 years old.
State v. Hicks, 239 N.C. App. 396, 406-07, 768 S.E.2d 373, 379 (2015).
In this case, the trial court instructed the jury as follows:
The defendant has been charged with first degree sexual offense. For you to find the defendant guilty of this offense, the State must prove three things beyond a reasonable doubt.
First, that the defendant engaged in a sexual act with the alleged victim ....
Second, that at the time of the acts alleged the alleged victim was a child under the age of 13.
And third, that at the time of the alleged offense, the defendant was at least 12 years old and was at least four years older than the alleged victim.
These instructions track the language of first-degree sex offense under N.C. Gen. Stat. § 14-27.4(a)(1). Pursuant to their instruction, the jury found Defendant guilty of first-degree sex offense with a child under N.C. Gen. Stat. § 14-27.4(a)(1) which is the lesser included offense of sex offense with a child, adult offender, N.C. Gen. Stat. § 14-27.4A. See Hicks at 406-07, 768 S.E.2d at 379.
A defendant may be convicted of a lesser included offense when the greater offense included in the indictment includes all the elements of the lesser included offense. State v. Snead, 295 N.C. 615, 622, 247 S.E.2d 893, 897 (1978). Here, the jury charge on the elements of first-degree sex offense under N.C. Gen. Stat. § 14-27.4(a)(1), resulted in a conviction for that offense, which is the lesser-included offense of the offense alleged in the indictment. The indictment in this case is sufficient to support a conviction of the lesser-included offense of first-degree sex offense. A verdict of guilty of sex offense with a child by an adult offender under N.C. Gen. Stat. § 14-27.4A, the offense described in the indictment, requires the State to prove all the elements of N.C. Gen. Stat. § 14-27.4(a)(1), plus the additional element Defendant was at least 18 at the time of the offense.
Here, the trial court instructed the jury on the lesser offense captioned at the top of the indictment. Even if both the indictment's caption and body described the greater offense of "Sexual offense with a child, adult offender" under N.C. Gen. Stat. § 14-27.4A, Defendant still cannot "demonstrate that a fundamental error occurred at trial." State v. Lawrence , 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012). Because the trial court instructed the jury on the lesser included offense, and because Defendant was convicted of the lesser included offense, we overrule Defendant's first assignment of error. However, since the judgment sheet is ambiguous as to whether the trial court sentenced Defendant for first-degree sexual offense under N.C. Gen. Stat. § 14-27.4(a)(1) or for sex offense with a child; adult offender under 14-27.4A, we vacate Defendant's sentence and remand to the trial court for re-sentencing the Defendant for the offense for which he was convicted: First-degree sexual offense under N.C. Gen. Stat. § 14-27.4(a)(1), a class B1 felony.
Defendant next contends the trial court erred in excluding witness testimony tending to show Carla failed to identify Dave Scott ("Scott"). At trial, Sergeant Matherly testified Carla disclosed Scott's name as another possible suspect who had molested her. Sergeant Matherly initially found out about Scott from her interview with Carla. Sergeant Matherly also learned an individual named Michael David Scott had visited Defendant in jail. Sergeant Matherly believed Carla would be able to identify Scott in a photo lineup, but Carla was ultimately unable to do so. At trial, Sergeant Matherly confirmed the investigation into Scott is currently inactive, and no one by the name of Scott was arrested.
In his brief, Defendant refers to his constitutional right to due process and to confront accusers. However, Defendant advances no substantive argument as to how the trial court's decision to exclude this evidence violates Defendant's constitutional rights. At trial, Defendant did not bring forward a constitutional challenge to the court's decision to exclude this evidence. "[A] constitutional question which is not raised and passed upon in the trial court will not ordinarily be considered on appeal." State v. Hunter , 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982). Additionally, "[i]ssues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned." N.C. R. App. P. 28(b)(6) (2016). Defendant's suggestion this second assignment of error implicates a violation of Defendant's constitutional rights is deemed abandoned.
Defendant also argues this excluded evidence would have permitted the inference Carla "made up th[e] allegation" about Scott and this "could [have] ma[d]e her credibility on the whole questionable." Even if evidence is relevant, it still "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2016). "This determination is within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was 'manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.' " State v. Young , 368 N.C. 188, 210-11, 775 S.E.2d 291, 306 (2015) (quoting State v. Hyde , 352 N.C. 37, 55, 530 S.E.2d 281, 293 (2000) ) (alteration in original).
Here, Defendant's counsel elicited testimony from Carla about her allegations concerning Defendant's friend, Scott. Scott was in the room on some occasions when Defendant sexually abused Carla. Scott touched Carla in some instances. Carla also initially disclosed Defendant was the only one who had abused her. Sergeant Matherly gave direct testimony she found a possible suspect concerning the Scott allegations based upon her review of Defendant's jailhouse visitation records. However, during the photo lineup which included Scott, "there was not 100% identification made" by Carla. The State objected to continued questioning of Sergeant Matherly on cross, since it had "already been established that nobody has been identified."
The court recognized the value of allowing Defendant's inquiry which would permit the jury to consider "if [Carla is] inaccurate on one description she may be inaccurate on another description, [and] the credibility aspect of that." However, the trial court sustained the State's objection based upon the trial court's determination it would confuse the jury as to whether further questioning about the photo lineup would result in a "separate mini trial" or a "secondary case" about a person named Scott.
Defendant has failed to show the trial court's determination was manifestly unsupported by reason and therefore an abuse of discretion. Additionally, a comparison of Defendant's proffered evidence and Sergeant Matherly's testimony shows the jury could consider Defendant's evidence. Defendant cannot show a different result would have been reached if the court allowed Defendant's continued cross-examination on this issue. We overrule Defendant's second assignment of error.
Defendant next contends the trial court committed plain error by admitting unchallenged testimony from Dr. Wall and Dr. Hagele stating Carla's symptoms were consistent with those of children who have been sexually abused. Defendant asserts this testimony amounts to allowing these two experts to impermissibly vouch for Carla's credibility.
This Court has consistently held that an expert witness can properly "testify on the credibility of children in general who report sexual abuse." State v. Oliver , 85 N.C. App. 1, 13, 354 S.E.2d 527, 534 (1987). However, "our courts have held expert testimony inadmissible if the expert testifies that the prosecuting child-witness in a trial for sexual abuse is believable, or to the effect that the prosecuting child-witness is not lying about the alleged sexual assault." Id. at 11, 354 S.E.2d at 533 (internal citation omitted). "[A]n expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith." State v. Stancil , 355 N.C. 266, 267, 559 S.E.2d 788, 789 (2002).
Dr. Wall first began treating Carla in July 2012. She had previously seen a psychiatrist and a therapist in Dr. Wall's practice for a number of years. Carla made no reports of sexual abuse to these professionals. During this time, these prior professionals diagnosed Carla with generalized anxiety disorder, oppositional defiance disorder, adjustment disorder and ADHD.
Dr. Wall learned of Carla's disclosure of sexual abuse in March 2013 and he evaluated her the following month. Dr. Wall diagnosed her with post-traumatic stress disorder based on the abuse she claimed happened a few years prior. The State asked Dr. Wall if Carla's symptoms were consistent with a child's who has been sexually molested. Dr. Wall responded:
They are consistent with a child who's been traumatized. The-what often ties to the thing she reported to me, the nightmares about her uncle, each time this case was to come to trial, more intrusive memories of what had occurred happened. More nightmares occurred. More sleep disturbance occurred. So I would say, yes.
Defendant contends this response went beyond the permissible expert opinion. Defendant contends here Dr. Wall expressed to the jury the fact that he believed Carla's sexual contact with her uncle had actually occurred and was the cause of her symptoms.
The State asserts Dr. Wall offered this testimony after he explained the general symptoms of PTSD, testified he had diagnosed Carla with PTSD, and affirmed Carla's symptoms were consistent with those of children who had been sexually abused. Specifically, Dr. Wall testified children with PTSD as a result of sexual trauma exhibit several symptoms. Such symptoms include: (1) re-experiencing the abuse by having intrusive nightmares or memories that are "disturbing" and "induce sadness, fear, horror, anger"; (2) an "intense physiologic response to trauma cues that may be akin to panic"; (3) "psychological distress that can take many forms but people may claim to be anxious, upset, nervous"; and (4) a degree of "hyper arousal that is quite common in children in the form of irritability, difficulties with their sleep, exaggeration, startle," meaning when you walk up to them and touch then unexpectedly "they go through the roof."
Dr. Wall offered the challenged testimony to report the specific symptoms Carla experienced which were consistent with those of a child who had been diagnosed with PTSD. Such symptoms included Carla's "reported nightmares about her uncle" each time the case was set to go to trial. Thus Dr. Wall's statements addressed whether Carla's symptoms were consistent with sexual abuse. He provided an example of how these symptoms are consistent with abuse, rather than stating abuse actually occurred. We conclude at no point did Dr. Wall express an opinion stating Carla was believable, credible or telling the truth. Dr. Wall also did not opine whether Carla was sexually abused by Defendant or whether any sexual abuse occurred.
The State tendered Dr. Hagele as an expert in child abuse pediatrics. During direct, she misstated the date Carla moved out of her grandmother's home. Dr. Hagele stated Carla moved out of her grandmother's home in February 2011, rather than the parties' stipulated date of March 2010. Dr. Hagele explained, "I am not an investigator, I am not a forensic interviewer. [I am] a doctor trying to establish a medical diagnosis. So my motivation is to get to the truth, to see what's going on in a patient's life." Defendant did not object. However, Defendant now contends Dr. Hagele impermissibly implied she relayed the truth from Carla "because she did not have other motivations."
Reading these statements from Dr. Hagele in context, it is clear Dr. Hagele was intending to make sure the jury knew she was conducting a medical interview, and not a police interview. Additionally, Dr. Hagele asserted her statements were truthful because she is a doctor. We conclude the trial court did not err in allowing this statement from Dr. Hagele. Dr. Hagele did not express her opinion Carla was truthful, believable or credible. Here, Dr. Hagele also did not impermissibly opine Carla was sexually abused by Defendant. Even if this Court concluded the trial court erred by allowing these statements from Dr. Wall and Dr. Hagele, Defendant has not demonstrated this error arises to the level of plain error. See Lawrence at 518, 723 S.E.2d at 334 ("To show that an error was fundamental, a defendant must establish prejudice, that, after examination of the entire record, the error had a probable impact on the jury's finding that [he] was guilty." (internal quotation marks omitted)).
Additionally, Dr. Hagele testified, "[b]ased on my training and based on my experience, Carla's history and symptoms are consistent with a child who's experienced sexual abuse." Dr. Hagele then testified, over objection:
So I guess, I can relate to Carla's case or just more generically. But grief is a normal experience that a child or an adult has when there's been a significant loss of a caregiver usually or an important family member or important friend. That is grief and there can be, you know, bad dreams and sadness and tearfulness and those kinds of things.
What I was concerned with, as I testified earlier, was about those symptoms of re-experiencing, avoidance, those flashbacks, that agitated physiologic state that she was describing. She was attributing those, as I documented at the time, to the physical contact with her Uncle Danny.
So, in other words, what she was describing was flashbacks, nightmares, insomnia, avoiding him, avoiding thoughts of him, and she was attributing them very specifically to physical contact with him.
In addition to that, what I know about Carla's life is she did have some significant loss that certainly caused her sadness. A sense of loss. Sense of pain. That's is [sic] grief. That's different than the continuum of post-traumatic stress disorder which has psychological trauma associated with it. It's different.
Our review of this testimony indicates Dr. Hagele offered these contested statements after she affirmed Carla's symptoms were consistent with those of children who have been sexually abused, and after the State asked Dr. Hagele to describe the difference between "grief" and PTSD or "trauma." Specifically, Dr. Hagele's testimony concerning Carla's symptoms of "re-experiencing, avoidance, those flashbacks, that agitated physiologic state that she was describing" were consistent with people diagnosed with PTSD and not merely suffering from grief. We conclude in this testimony Dr. Hagele did not express an opinion Carla was believable, credible, or telling the truth. Dr. Hagele also did not give an opinion that Carla was sexually abused by Defendant or that any sexual abuse occurred.
Furthermore, during cross, Dr. Hagele stated:
But the other thing is she specifically tied symptoms that are consistent with PTSD to her experience of her physical contact with her Uncle Danny. So she wasn't generically saying, I'm having flashbacks. She's saying, I'm having flashbacks about contact with his penis. So it was very specific.
She's giving me symptoms. She's giving me history. She's giving me idiosyncratic detail. Descriptions of what things felt like. What they looked like. Ejaculation. Very specific content.
And she's tying it to very classic symptoms that we see associated with a child-consistent with a child who might have experienced sexual abuse.
Also on cross, defense counsel asked Dr. Hagel if children could sometimes be led by adults to make up claims of abuse. Dr. Hagele responded:
What I would say is, is it-I'm not speaking about Carla. But is it theoretically possible that a child could be influenced by an adult to the child themselves [sic] make up a false claim? Is that what you're asking?
....
Not in reference to this case, I think that's-but what you're describing is theoretically possible in my opinion.
Defendant contends Dr. Hagele's comment, "[n]ot in reference to this case," amounts to Dr. Hagele impermissibly vouching for Carla's credibility. Defendant further contends the above-quoted testimony shows Dr. Hagele's belief Carla had, in fact, suffered the observed symptoms because she had been abused by Defendant. Defendant contends this is another instance where Dr. Hagele "vouches" for Carla's credibility.
This Court has held, "[s]tatements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot be prejudiced as a matter of law." State v. Gobal , 186 N.C. App. 308, 319, 651 S.E.2d 279, 287 (2007) ; see N.C. Gen. Stat. § 15A-1443(c) (2016). "Thus, a defendant who invites error has waived his right to all appellate review concerning the invited error, including plain error review." State v. Barber , 147 N.C. App. 69, 74, 554 S.E.2d 413, 416 (2001). Here, defense counsel elicited the above-quoted statements by Dr. Hagel during cross-examination. Therefore, "since this alleged error was clearly invited by Defendant, it provides no basis for an award of appellate relief." State v. Dew , 225 N.C. App. 750, 758, 738 S.E.2d 215, 221 (2013). We overrule Defendant's third assignment of error.
Defendant next contends the trial court erred in ordering Defendant to submit to lifetime registration as a sex offender, rather than to registration for 30 years. We agree.
A sex offender is normally subject to registration for 30 years, unless the defendant is (1) a sexually violent predator; (2) a recidivist; or (3) convicted of an aggravated offense. N.C. Gen. Stat. § 14-208.6A (2016). In those cases, a defendant is subject to registration for the duration of his natural life. Id. Here, in determining Defendant's registration requirements, the trial court found Defendant had been convicted of an aggravated offense under N.C. Gen. Stat. § 14-208.6(1a).
This Court has determined neither first-degree sexual offense nor indecent liberties with a child qualify as aggravated offenses as defined under N.C. Gen. Stat. § 14-208.6(1a). See State v. Treadway , 208 N.C. App. 286, 301, 702 S.E.2d 335, 347-48 (2010) (holding first-degree sexual offense is not an aggravated offense); State v. Davison , 201 N.C. App. 354, 361-63, 689 S.E.2d 510, 515-16 (2009) (holding indecent liberties is not an aggravated offense).
Here, because Defendant was convicted of first-degree sex offense and indecent liberties, and because neither of those offenses qualifies as an aggravated offense, the trial court erred in ordering Defendant to register as a sex offender for the duration of his natural life. However, this error "does not preclude the trial court from ordering, on remand, that defendant register as a sex offender 'for a period of 30 years.' " State v. Phillips , 203 N.C. App. 326, 331, 691 S.E.2d 104, 108 (2010).
We vacate the trial court's order requiring Defendant to register as a sex offender for the duration of his natural life, and remand this action to the trial court to enter an order requiring Defendant to register as a non-aggravated sex offender under N.C. Gen. Stat. § 14-208.7(a) for a period of 30 years.
Defendant next contends the trial court erred in ordering Defendant to enroll in lifetime SBM without making a determination of the reasonableness of the program. We agree.
The United States Supreme Court recently held North Carolina's satellite based monitoring program constitutes a search for Fourth Amendment purposes. Grady v. North Carolina , --- U.S. ----, ----, 135 S. Ct. 1368, 1370-71, 191 L.Ed. 2d 459, 462 (2015). This Court subsequently held a trial court must "determine, based on the totality of the circumstances, if the SBM program is reasonable when properly viewed as a search." State v. Blue, --- N.C. App. ----, ----, 783 S.E.2d 524, 527 (2016) Additionally, the State "shall bear the burden of proving that the SBM program is reasonable." Id. at ----, 783 S.E.2d at 527.
Here, the State concedes the trial court erred by failing to conduct a Grady reasonableness hearing before ordering Defendant to enroll in SBM upon his release from prison. We therefore vacate the trial court's order of lifetime SBM on Defendant, and remand this matter to the trial court to determine whether, based on the totality of the circumstances, an imposition of SBM on Defendant is reasonable.
In his final assignment of error, Defendant contends the judgment and commitment form contains a clerical error requiring remand for correction. We disagree.
The jury convicted Defendant of first-degree sex offense with a child, a Class B1 felony. N.C. Gen. Stat. § 14-27.4(b) (2013). The trial court consolidated this conviction with Defendant's conviction for indecent liberties for judgment. The grand jury indicted Defendant for committing these offenses between 1 January 2009 and 12 May 2011. During sentencing, the State acknowledged the date ranges for these offenses implicated "two different sentencing charts that cover the two time periods in the indictment."
At sentencing, the trial court determined Defendant had one prior record level point. An offender with one prior record level point was a prior record level II offender for offenses committed between 1 January 2009 and 30 November 2009. See N.C. Gen. Stat. § 15A-1340.14(c)(2) (2007). The presumptive range for a Class B1 offender who had a prior record level II was 230 months to 288 months imprisonment. N.C. Gen. Stat. § 15A-1340.17(c) (2007).
However, for offenses committed after 1 December 2009, an offender with one prior record level point was a prior record level one offender. See N.C. Gen. Stat. § 15A-1340.14(c) (2009) ; 2009 N.C. Sess. Laws 1528, 1528-30, ch. 555 §§ 1-3. Here, a prior record level one offender, when sentenced in the presumptive range for a Class B1 offense, would receive a sentence of 192 months to 240 months imprisonment. See N.C. Gen. Stat. 15A-1340.17(c) (2009) ; 2009 N.C. Sess. Laws 1530, 1530-32, ch. 556 §§ 1-2.
Before the trial court announced its sentence in open court, the trial court stated:
[Defendant] is a prior record level one for disposition purposes. Because of the range of dates contained in the indictment, the Court has reviewed the various sentencing guidelines or-and grids over that period of time .... I'm using the [sentencing guidelines] from December 1, 1995 through November 30, 2009, because that is the least severe one; actually, both appear to-the-the-both grids that cover the range appear to have the same sentencing guidelines in the applicable grid.
The trial court then sentenced Defendant in the presumptive range to a minimum term of 240 months imprisonment and a maximum term of 297 months imprisonment. The trial court gave Defendant credit for 977 days in confinement.
The written judgment reflected the trial court's sentence stated in open court, and correctly indicated Defendant had one prior record level point. However, contrary to the trial court's statement at the hearing, the judgment indicates Defendant was a prior record level II offender. This judgment shows Defendant a prior record level II offender because the date in the "Offense Date" section of the judgment form lists the offense occurring on 1 January 2009. This 1 January 2009 date corresponds to the prior record level for an offender with one prior record level point as set forth in the applicable version of N.C. Gen. Stat. § 15A-1340.14(c).[2]
Because the judgment sheet is ambiguous as to whether the trial court sentenced Defendant for First-degree sexual offense under N.C. Gen. Stat. § 14-27.4(a)(1) or for Sexual offense with a child; adult offender under 14-27.4A, we vacate Defendant's sentence and remand to the trial court for re-sentencing the Defendant for the offense for which he was convicted: First-degree sexual offense under N.C. Gen. Stat. § 14-27.4(a)(1), a class B1 felony.
NO ERROR IN PART; VACATED IN PART; REMANDED IN PART.
Report per Rule 30(e).
Judges DAVIS and MURPHY concur.

In one interview Carla denied Defendant ever touched her with anything other than his body. But in another interview with Sergeant Matherly, she stated Defendant used a blue vibrator with her.

Compare N.C. Gen. Stat. § 15A1340.14(c) (2007) with 2009 N.C. Sess. Laws 1528, 1528-30, ch. 555 §§ 1-3.